## DUNNIGAN, Appellant, v. GREEN.

### Division One, November 19, 1901.

**Fraud in Exchanging Lands: AGENCY: RATIFICATION.** The title to farm land was in the wife and in order to facilitate trading or selling it during the husband's absence from the State, they made and acknowledged a deed to their son, but did not deliver it. The owner of city lots proposed to her agent to exchange them for her land, and she knew the exchange could not be made while she held the unrecorded and undelivered deed. Her agent took her to see the lots, which were incumbered with a mortgage for $850, which she was required to assume, which she stated she did not wish to do and further objected that the price of the lots was too high. But she agreed to consider the trade, and a few days later wrote the agent a letter in which she stated she liked the property well, and inclosed the deed to her son. She had previously been asked by the agent if her son would sign a deed and she said she did not know, and testified herself that when the agent said he would go see the son she said nothing. She afterwards met her son and said she had been looking at the city lots with a view of exchanging her farm for them, and that she did not think she would trade because the price was too high, but said to him, "If I happen to make a deal may be I will call on you to help me make a deed." The agent said he met the son on the car of which he was motorman, and asked him if he was the son to whom the deed was made, and when he said yes, delivered it to him, then asked him to execute and acknowledge the deed from him to the owner of the lots, which he did, and then taking both deeds to his office, notified defendant he was ready to consummate the trade. The son, who was twenty-nine years old, testified that he was induced to sign the deed by representations of the agent that his mother was making a will and wanted to deed

him a piece of land and will him a couple of lots. A few days later the son wrote his mother that he had executed the deed, and next day she called on the agent but said nothing about the trade or the deed to defendant, nor did she see her son, or make any objection to his having made the deed, or in anywise express her disapproval, and a week later she called two or three times at the office of the agent, who was absent, but did not leave any protest with his clerks about the trade, but did each time state that she wished to see him. On that very day the agent met defendant's agent and they exchanged deeds. At the time of her last call on that day, the agent's clerk had her sign a receipt in which she approved of his charge of $350 for consummating the trade, and, which contained recitals concerning a settlement of some other matters, in which she did not get as much money as she was expecting, but even then she did not express objection to the trade, but next day she did for the first time. The defendant was innocent of any wrongful conduct. *Held*, that there is no ground for setting the deeds aside as being fraudulent, there being no equity in her claim. *Held*, also, that the son did not hold the naked legal title as trustee for his mother, and that by making the deed to defendant, defendant became his mother's trustee, not even if defendant knew that the title was in her and that the trade could be consummated only by her consent, for she and her husband had made the deed to her son in order to enable her to perfect a sale in the husband's absence from the State.

Appeal from Crawford Circuit Court.—*Hon. L. B. Woodside, Judge.*

AFFIRMED.

*Henry Kortjohn* for appellant.

(1) The question asked Mrs. Dunnigan as to what her son said at Printz's office as to circumstances under which deed was signed, was a proper one, and witness should have been permitted to answer same. (2) The witness, P. William Dunnigan, should have been permitted to answer the following question: "What had your mother ever told you about any Crawford county property or trade?" (3) The beneficial title of the real estate never was in P. William Dunnigan; the

legal title was not even in him; but even if he had the legal title, yet the equitable title was in his mother, the plaintiff, and therefore defendant Green, who knew the facts, was bound to know the legal effect of the deed to P. Wm. Dunnigan. (4) While Mrs. Dunnigan's title was an equitable one, yet there is no pretense that the land was held by her as her sole and separate estate, and therefore she could not sell her equitable title without her husband joining with her in the deed. Sec. 901, R. S. 1899; McReynolds v. Grubb, 150 Mo. 352; Clay v. Mayr, 144 Mo. 376; Winn v. Riley, 151 Mo. 61; Hurt v. Cook, 151 Mo. 416. (5) The only title to the Crawford county land which defendant Green acquired, was the bare legal title of P. William Dunnigan, and he holds the title in trust for plaintiff. (6) Defendant gave nothing for the land excepting two lots, which Mrs. Dunnigan still holds, therefore, even if he had acquired the beneficial interest in the property he could not hold it, under the circumstances, against plaintiff. Amholt v. Hartwig, 73 Mo. 485; Young v. Kellar, 94 Mo. 581; Dougherty v. Cooper, 77 Mo. 528; Greenlee v. Marquis, 49 Mo. App. 291.

*Farris & Norvell* for respondent.

(1) In this case the pleadings of plaintiff and the undisputed facts as shown by her evidence, is that plaintiff and her husband executed the deed to the son for the purpose of conveying title to the land, and the court declares that the subsequent delivery of the deed to Printz, was for that purpose. Again, she does not in her bill seek to avoid the trade on that ground, and she would be estopped from doing so, if she desired. McReynolds v. Grubb, 150 Mo. 352; Hunt v. Cook, 151 Mo. 416; Grandy v. Campbell, 78 Mo. App. 505; Brown v. Dressler, 125 Mo. 589. (2) The defendant gave plaintiff valuable property, with good title, in exchange for hers. He was guilty of no misconduct or unfairness upon his own part.

If any wrong was perpetrated upon plaintiff, it was by her own agent, whom she had placed in a position, by allowing him to represent her, to commit the wrong. His acts, the court finds, were her acts, and she can not complain and seek to avoid the sale on account of her own conduct.

MARSHALL, J.—This is a bill in equity to divest title to a farm of one hundred and thirty-three acres, in Crawford county, out of the defendant and vest it in the plaintiff, she offering to reconvey two lots in the city of St. Louis to Green. There was a decree for the defendant in the circuit court and the plaintiff appealed.

The facts are these:

The plaintiff is a married woman, living in Jefferson county. She can not write English. Arthur G. Printz, a real estate agent in St. Louis, had been her agent for about two years. He transacted business for her, loaned money for her, and on January 7, 1898, he had $600 of her money in his hands for investment. On the twenty-seventh of October, 1890, the plaintiff and her husband executed a deed to the Crawford county farm to their son, P. William Dunnigan, to enable the plaintiff to sell it whenever she desired. This was done because her husband contemplated leaving the State. The deed never was delivered to the son, however, but remained in Mrs. Dunnigan's possession until March, 1898. Plaintiff learned that forty acres of her farm had been sold for taxes, and in January, 1898, she went to see Printz to get him to investigate the matter. She did not find him but left word for him. On the seventh of January, 1898, Printz wrote to her asking if he should go to Crawford county to look into the matter. On the twelfth of January plaintiff wrote to Printz asking him to go to Crawford county and straighten out the matter. Printz did so, and had an abstract of the title made. At Cuba he met, for the first time, the defendant Green, and Printz told Green the object of his visit to Crawford county.

During their talk Green proposed to exchange two lots he had in the city of St. Louis for the farm. Considerable correspondence afterwards took place between Printz and Green about the exchange, each disparaging the property offered by the other. On the twenty-eighth of February, Green wrote to Printz that if the farm suited him he would make the exchange, but that the lots would have to be taken subject to a mortgage of $850 which was on one of them, and asking who the deed to the lots should be made to. On the second of March, Printz wrote to Green in answer to his letter of the twenty-eighth of February, that he would make the trade, but did not give the name of the person to whom the lots were to be deeded. On the sixth of March, Green went to St. Louis and met Printz the next day at his office. Printz told Green that he would have to write to Mrs. Dunnigan to come in and see the lots, and that as she lived in the country it would be Saturday before the letter would reach her. Some time afterwards Mrs. Dunnigan went to St. Louis and Printz told her for the first time of the proposed exchange. She said she was willing to make the exchange if it was a good trade for her. Printz took her out and showed her the lots and told her the price of one of the lots was $2,200, and that it had a mortgage on it for $850, which she would have to assume, and the price of the other lot was $750. She thought the prices were too high and objected to taking land with a mortgage on it. Printz told her he would try to get the prices down, and she agreed to take the matter under advisement. Printz then asked her if she did not have a deed to the farm which she had executed to her son. When she asked him how he knew about the deed, Printz told her that Mr. Kortjohn had told him about it. There was a deed of trust upon the farm which Mrs. Dunnigan had paid off and had in her possession, but which had never been released, and Printz told her to send him the deed of trust and notes and also the deed she had made to her son. She said "Mr. Printz, you are not going to make a bargain

without I am satisfied?" He answered, "Of course not." On, the eighteenth of March, Mrs. Dunnigan sent the following letter to Printz:

"Houser Springs, Missouri, March 18, 1898.

"According to promise I send you those papers, the three notes *and the deed of my son,* and I am surprised that I can not find the deed of trust among my papers. I am almost sure I had it before my eyes when I gathered those tax receipts which I delivered to you. I looked among all my papers and didn't find it, but maybe it was mislaid, and I may find it yet accidentally. If I find it I will send it. I came home a day later than I expected, otherwise the papers would have been sent sooner.

"Now I wish to tell you again I like the property well, what you showed me. I will close, hoping to hear from you soon..

"Yours respectfully,

(Signed in German)       "MARY M. DUNNIGAN.

This letter was written by Mrs. Dunnigan's other son at her dictation and was signed by her.

Concerning the deed to her son and where he could be found, Mrs. Dunnigan testified as follows:

"Just the very evening I had seen the property I happened to meet my son. I told him I had been to look at some Oak Hill property and De Hodiamont property; that I had seen the lots and was talking about trading the farm for them; but I said I don't think we will make any trade because the price is too high, and I said if I happen to make a deal maybe I would call you to help me make a deed. On the day I looked at the property I told Printz where my son could be found; he asked me and of course I told him. I told him he was on the Cass avenue line. I told him where my son could be found because he asked me. I don't know what he asked me for.

"Q. Didn't he tell you the day you made the trade that your son would make the deed instead of you? A. No, sir; my son had nothing to do with it.

"Q. Didn't you say to him on that day that you and your husband made a deed to your son, that your husband was contrary and wouldn't make a deed, and for that reason some years ago you had a deed made to your son so you could have it in his name as a matter of convenience in making a trade? A. No, sir; when I found out he knew it was in existence, I told him it was in my son's name, and it was left in my hands for fear I needed it when my husband went away.

"Q. What use would you have for it when he went away? A. I don't know, but my husband told me that; that is what he told me, that it was only when he went away that I might want to use it.

"Q. Then in the conversation about this deed and this trade you told Printz where your son could be found? A. Yes, sir; and he asked me, 'Would your husband sign a deed?' and I told him I didn't know, and he says, 'Will your son sign a deed?' and I says, 'I don't know,' and he says, 'I will go and see him,' and I said nothing."

On the twenty-first of March, 1898, Printz saw Mrs. Dunnigan's son, P. William Dunnigan, and procured from him a deed to Green for the Crawford county farm. There is a sharp conflict in the testimony of Printz and the son as to what took place when this deed was executed.

Printz's account is as follows:

"Q. You may state what was said between you? A. Mrs. Dunnigan told me she would take the proposition under consideration, and in case she saw fit to make a deal she would send me a deed made from herself and husband to P. William Dunnigan, and that she would explain the matter to her son and instruct him, if she wished to make the deal, to sign the deed. In compliance with that agreement I received the deed from Mary M. Dunnigan and her husband to P. Wm. Dunni-

gan, and I received the letter of March 18, just as it is.  The
letter was received in the same envelope with the deed.  (Wit-
ness identifies the envelope.)    After I received the deed I saw
Mrs. Dunnigan's son.

"Q.    Who told you his whereabouts ?    A.    Mrs. Dunni-
gan, at the time I left her.    At the time she instructed me to
tell him she would take the property under consideration and
gave me his address and told me where he could be found.
When I went to see her son I inquired at Fifth and Walnut
streets, and was told that Dunnigan would be down on the
next car.    I waited and got on the next car and asked the
motorman if his name was P. William Dunnigan, and he said
yes.    I says, 'Did your mother tell you anything about deeding
some property to you some years ago, or a farm in Sullivan,
Missouri ?' and he says, 'Yes.'    I says, 'Did she tell you she
had a trade in prospect, that she had seen some lots in De Hod-
iamont and Oak Hill,' and he said yes; I then asked him 'if
she instructed him to sign a deed, conveying the property in the
trade, and he said yes.    I then produced the old deed from
Mary M. Dunnigan and husband to P. William Dunnigan and
showed it to him to convince him it was in his name.    I then
produced the deed from P. William Dunnigan to James A.
Green and read it to him and explained to him what it was and
showed him the consideration and told him to sign the paper
or deed.

"Q.    Is this the deed ?    A.    That is the deed, yes, sir;
and after he had signed the deed I took his acknowledgment
and had him hold up his right hand and asked him if he
acknowledged that to be his act and deed, and if he was a
single man, and he said he was.

"Witness continued:    I delivered the deed from Mary M.
Dunnigan and wife [husband] to P. William Dunnigan, and
P. William Dunnigan to James A. Green to Mr. Bass, and
received in return one deed to the Oak Hill property from
James A. Green, and I received another one from Mr. Bass to

the De Hodiamont property. I saw Mrs. Dunnigan on the same evening after I closed the deal, Tuesday evening, April 19, at my office. I told her we had just closed the deal for the farm and trade for the ground. She simply said, 'Why didn't you let me know before you made the deed.' She said she didn't like the deed in her name, because she would have trouble in conveying it when the property was sold, from the fact her and Mr. Dunnigan were not on the best of terms and he would refuse to sign it. She seemed dissatisfied that she had to assume the deed of trust for $850. She asked me then about $350 she had there, and I told her that was used to consummate the deal."

On the other hand the son's account of what took place when he executed the deed is as follows:

"I am a motorman. (Witness being shown a deed made by Mary M. Dunnigan and John Dunnigan, her husband, dated the twenty-seventh day of October, 1890, stated that he had never seen that deed before. That he first learned of its existence about Monday, April 18.) I happened to go out in the country and my father mentioned it to me. I don't know Mr. Printz; I just met him; the first time I ever met him was when he brought the deed to me, which is made by P. William Dunnigan to James A. Green, dated the twenty-first day of March, 1898. At that time I knew nothing of the existence of the other deed. I met Printz on Broadway and Walnut, the city terminus of the street cars; I was attending to my business as motorman, and we stopped there just long enough for me to sign the deed. He asked me if my name was Dunnigan, and I told him yes. He says, 'You are a son of Mary M. Dunnigan?' and I says, 'yes.' We were out there in front then and he said, 'You are P. William Dunnigan?' and I says, 'Yes.' He said, 'Did your mother tell you anything about trading for some lots and signing a deed?' and I says, 'She was talking about trading some lots for a Crawford county farm," and he said, 'She is making a will and wants to

deed you a piece of land and will you a couple of lots, and he says I am waiting to have it recorded."·

"Q. What did he ask you to do about signing the deed? A. He asked me about the deed, and says, 'I was waiting to have it recorded,' and he had it in his hand, and of course I signed it. Of course, I had no time to waste and I was busy.

"Q. Had your mother ever told you to sign any deed? A. No, sir.

"Q. What had your mother ever told you about any Crawford county property or trade?

"Objection by counsel for the defendant to the last question. The objection was by the court sustained; to which action of the court in sustaining said objection counsel for plaintiff excepted at the time.

"Q. Had your mother ever asked you to sign the deed? A. She had in case she made a trade; that I would have to help make the deed.

"Q. She told you in case she made a trade you would have to help make the deed. A. Yes, sir; but she said she didn't think she would make the trade because the lots were too high."

On the same day that the son executed the deed to Green, to-wit, March 21, 1898, Printz wrote to Green to send him the abstract to the city lots, and told Green that he had his deed all ready. He added: "I will then let you know whom to make deeds to." On the first of April, Printz wrote to Green to make the deeds to the lots to Albert O. Kriebohm, and said he would let him know what day the deal could be closed, so Green could come to the city. On the thirteenth day of April, Printz wrote to Green that he was ready to close the deal, and asked him to come to St. Louis on the eighteenth of April, and he would meet him at the Laclede Hotel. Green executed the deeds to Kriebohm as directed and instead of going to St. Louis, he sent Mr. Bass in his stead. Printz and Bass met at the Laclede Hotel on April 19, and Printz delivered to Bass

the deed from the plaintiff and her husband to their son, and the deed from the son to Green, and Bass delivered to Printz the deed from Green to Kriebohm. Green recorded his deeds in Crawford county on the twenty-first of April, and Printz recorded the deed from Green to Kriebohm and also a deed from Kriebohm to Mrs. Dunnigan for the city lots.

In the meantime, the son says that about the twelfth of April he began to feel uneasy about the matter, and so went to Printz to see about it. Printz told him his mother would explain it to him. He waited until the eighteenth for his mother to come to the city and as she did not do so he went to the country to see her about it. She, however, had gone to the city, so the next day he returned to the city and on Wednesday, the twentieth, he met his mother at Printz's office. He testified that he never saw or had possession of the deed from his mother and father to him; that Printz never told him that the trade had been made. "I told him that she had talked about trading off Crawford county property for some lots." He further testified that he was twenty-nine years old. He was asked this question: "Hadn't your mother told you that you would have to help make a deed?" and he answered: "In case she wanted a trade."

Mrs. Dunnigan first learned that her son had made the deed to Green, through a letter from her son dated about the tenth of April, in which he asked her whether he had done right or wrong. She went to St. Louis the next day to see Printz, and asked him about her money and he promised to pay her the next time she came in. Nothing was said at that time about the farm or the lots, although she knew that her son had executed the deed to Green. She went home, but returned to the city on the eighteenth of April. She tried to find Printz that day and the next, but failed to do so. On the evening of the nineteenth the clerk turned over to her a deed of trust and three notes secured thereby, the principal note being for $250 and the two interest notes for $7.50 each, and the clerk asked

her to sign and she signed the following receipt:

"St. Louis, Mo., April 19, 1898.

"Received of Arthur G. Printz, one deed of trust and three notes, deed of trust calling for $250, due in one year from February 7, 1898; one being a principal note of same date and amount due same time, and two semiannual interest notes, each for the sum of $7.50 due same time, being loan made for me on Texas avenue and Sidney street, $200 cash returned to me February 4, 1898, making a total of $450; balance was used for making deal in trading farm, releasing all claim on me.

(Signed in German)          ."MARY M. DUNNIGAN.

Mrs. Dunnigan says she did not know that the receipt contained the words "balance was used for making deal in trading farm." The next day, the twentieth day of April, Mrs. Dunnigan saw Printz and she gives the following account of what took place:

"When I saw Printz on April 20 he told me that he had closed the deal. I told him I did not like it, and wasn't satisfied, and how he came to make a deal without me; he said that was all right, and I said no, that he had all the money and that property and it wasn't right, and I wouldn't have it. I then asked him for my money and he said he had put it on this deal—$350 of it. My son came into Printz's office while I was there, crying and dissatisfied. He told me how he had done."

This is the substance of all the facts shown on the trial. The circuit court found that Mrs. Dunnigan was the equitable owner of the Crawford county farm, and that she and her husband put the legal title in their son in order to enable Mrs. Dunnigan to sell it easier; that Printz was Mrs. Dunnigan's agent and was authorized by her to trade the Crawford county land for the city lots; that she sent Printz the deed to her

son for the purpose of having him close the deal; and that the son, P. William Dunnigan, knew what he was doing when he executed the deed to Green. And thereupon the court entered judgment for the defendants.

## I.

Mrs. Dunnigan never expressly agreed to the exchange of her farm for the lots. She objected to the price put on the city lots and also objected to taking land that was mortgaged. But she did know that Printz was endeavoring to make the exchange, and did know that the exchange could not be made while she held possession of the unrecorded and undelivered deed to the farm from herself and husband to her son. Yet she agreed to consider the trade and sent the deed to her son to Printz on the eighteenth of March, and wrote him, "Now I wish to tell you again that I like the property well, what you showed me." She told Printz where he could find her son, and says "He asked me would your husband sign a deed, and I told him I didn't know? and he says, 'Will your son sign a deed,' and I says I don't know, and he says, 'I will go and see him, *and I said nothing.*'" She also told her son before he made the deed that she had been looking at the city lots with a view of exchanging her farm for them, and that she did not think she would trade because the price was too high, "and I said if I happen to make a deal maybe I would call you to help me make a deed." She heard from her son on April 10 that he had made the deed to Green, and she went to St. Louis on the eleventh and saw Printz, but nothing was said about the trade or the deed to Green, and she only spoke to him about the $600 he owed her. She did not see her son or make any objection to his having made the deed to Green, but went home, where she remaned without saying anything in disapproval of the making of the deed, until the twentieth of April. The exchange and delivery of the deeds did not take place

until April 19.    When she came back to the city on the eighteenth she did not see Printz and it does not appear that she made any attempt to see her son, nor that she protested against or forbade the trade.    She went to Printz's office once on the eighteenth and twice on the nineteenth of April, and not finding Printz left word with his clerk that she wanted to see him. On her last visit to Printz' office on the nineteenth the clerk turned over to her the mortgage securing the loan for $250 and she executed the receipt which recited that the $350 balance of the $600 Printz owed her had been used for making the deal in trading the farm.    Even then she never said a word to any one about not being satisfied with the trade.    On the contrary she waited until the twentieth, the day after the trade was made, before she expressed any objection whatever.

· If the testimony of Printz is true that the son told him his mother had told him to execute the deed to Green, then Printz is guiltless of wrongdoing.    On the other hand, if the son's testimony is true that Printz told him that his mother was making a will and wanted to deed him a piece of land and will him a couple of lots and that on such representation this twenty-nine-year-old motorman of an electric car was induced to sign a deed to Green, then Printz was the guilty party. *En passant,* it may well excite surprise that any grown man could be induced to deed away property upon any such representations, for even a child would have known that if his mother was going to will him a piece of property and to deed him a couple of lots it was not at all necessary or proper for him to sign a deed conveying his mother's farm to Green.

But whichever reason may be the true one, what Printz did and what the son did would have been totally unavailing without the cooperation of Mrs. Dunnigan.    For if she had not sent the deed to her son to Printz, nothing that Printz or her son did could have transferred the farm to Green.    Aye more, even after she had sent the deed to Printz and even after her son had executed the deed to Green, she could still have

stopped the trade, for she knew from her son's letter of the tenth of April that he had executed the deed and her son asked her whether he had done right or wrong, and yet with this knowledge she went all the way to St. Louis and saw Printz on the eleventh of April and never said a word to him about the trade. She could easily have stopped the matter then, if she wished. But instead of forbidding the trade and, if necessary, of enjoining the delivery of the deed, she simply spoke to Printz about the $600 he owed her, and when he put her off she went home and stayed until the eighteenth and never said a word to Printz or to her son about the matter. She therefore knew, nine days before the deed was delivered and the exchange effected, that her son had made the deed to Green, and kept silent. She could and should have spoken and if necessary have invoked the aid of a court of chancery then. It is too late now. Printz and her son both did wrong, but both their wrongs combined could not have brought about the exchange without the acts and conduct of Mrs. Dunnigan and even after that she could have stopped the trade at any time between the tenth of April, when she learned that her son had made the deed, and the nineteenth of April, when the trade was consummated. But she kept silent and did nothing. There is no equity in her claim to aid from a court of chancery. Green said nothing and did nothing and knew nothing except what any innocent person would have done under the circumstances. His hands are clean in the transaction.

## II.

It is claimed that the trial court erred in sustaining defendant's objections to two questions, to-wit: first, to the question asked Mrs. Dunnigan: "How did your son say Printz did—what did your son say there in the office?" and, second, to the question asked the son: "What had your mother ever told you about any Crawford county property or trade?"

The question asked Mrs. Dunnigan referred to the conversation between Printz and Mrs. Dunnigan and her son on the twentieth of April, which was the day after the exchange had been made. Green was not present at that conversation, and, of course, could not be affected by anything that was said there. The answer to the question could only tend to show what the son thought of Printz's part in the transaction, and that was immaterial to the issues in this case, and, as hereinbefore pointed out, could not have helped the plaintiff's case in view of her own conduct and laches.

The question asked the son had already been fully answered by both the son and the mother, and, hence, no harm resulted to the plaintiff from the refusal to allow the matter to be gone into again.

## III.

It is next insisted that the son held the naked legal title to the farm and that the equitable title was in the plaintiff, and, hence, that in order to pass the equitable title to Green it was necessary for the plaintiff and her husband to join in the deed with the son, and as this was not done that Green is a mere trustee for Mrs. Dunnigan, and, further, that Green accepted the deed knowing that the son only held title as trustee for his mother, and it is now urged that a decree be entered here declaring Green a mere trustee for Mrs. Dunnigan.

It ought to be enough to say that the petition is not framed upon any such idea or theory, no such issue was tendered, joined or tried in the circuit court, and, hence, no such theory can be entertained for the first time in this court. But even if the point was open to review, there is nothing in this record to base such a contention upon. The pleadings aver and the proofs show that the title was placed in the son by a deed properly executed by Mrs. Dunnigan and her husband for the ex-

Vol 165 mo—8

press purpose of enabling Mrs. Dunnigan to sell the land during the absence of her husband from the State, without the necessity of having a deed executed by her and her husband. The records imparted no notice to Green, or to any one, of any trust for her benefit. But it is claimed that Green had actual notice.    The evidence does not support this contention.    On the contrary, on the twenty-first of March, Printz wrote to Green telling him to send his abstract of title to the city lots, telling him he had his deeds ready, and saying he would let him know to whom to make the deed to the lots.    On the first of April, Printz wrote to Green to make the deeds to the city lots to Albert O. Kriebohm.    The only other testimony in the case bearing upon Green's knowledge of Mrs. Dunnigan's interest in the farm is that when Green was in St. Louis some time between the first and twenty-first of March, he talked with Printz about the exchange of the farm for the city lots and Printz said he would have to write to Mrs. Dunnigan to come and see the lots and that it would be Saturday before he could hear by letter as she lived in the country.    When the exchange was made Green had the abstract of title to the farm and that showed the title in Mrs. Dunnigan.    When the exchange was made the deed from Mrs. Dunnigan and her husband to the son was turned over to Green as a part of the chain of title, and the deed from the son to Green completed the transfer.    This, therefore, not only fails to prove that Green knew that the son held the title in trust for his mother, but also is not sufficient to put Green upon inquiry, and if he had inquired he would have learned, what the petition alleges, that the deed to the son was made expressly to avoid the necessity for the husband and wife to make a deed.    This contention must therefore fail.

For these reasons the judgment of the circuit court is affirmed.    All concur.